Belknap,   }
June 2, 1908. }

WYATT v. STATE BOARD OF EQUALIZATION.

The tax upon savings bank deposits is a property tax, and is rightfully included by the state board of equalization in computing the average rate of taxation on property throughout the state, as a basis for the assessment of the taxes of railroad corporations.

PETITION for *certiorari*, to which the defendants demurred. Transferred from the November term, 1907, of the superior court by *Stone*, J., without a ruling.

*Shannon & Tilton* and *James W. Remick*, for the plaintiff.

*Edwin G. Eastman*, attorney-general, for the state.

*William B. Fellows* and *John M. Mitchell*, for the defendants.

*John R. Eastman*, pro se.

PARSONS, C. J.   The question in controversy is the meaning of the statute which provides that " every railroad corporation in this state, not exempted from taxation, shall pay to the state an annual tax upon the actual value of its road, rolling stock, and equipments on the first day of April of each year, at a rate as nearly equal as may be to the average rate of taxation at that time upon other property throughout the state." P. S., *c.* 64, *s.* 1.   Similar language is used in the sections governing the taxation of telegraph

and telephone companies (*Ib.*, *s.* 3), of express companies (Laws 1907, *c.* 81, *s.* 6), and of sleeping, dining, and parlor cars. Laws 1907, *c.* 91, *s.* 1.

The petition sets up the legal proposition that the rate is to be found by taking the average of the local tax rates, without including the assessment laid upon savings bank deposits and fire insurance capital. The defendants deny the plaintiff's proposition, and the case has been argued upon this point alone. All other questions have been waived for the time being, and the parties have united in an effort to present this controversy unhampered by any collateral issue.

The plaintiff says that his construction was adopted by the court when it acted as the assessing board; that the question was decided the same way in 1883, and that no change has been made in subsequent re-enactments of the statute; and that a construction including the savings bank tax in determining the average rate of taxation upon other property throughout the state would necessitate a conclusion that the statute is unconstitutional, unless it were held that the legislature intended to grant to railroads a special exemption supportable under the protective power.

The constitutionality of the statute is material in the present proceeding only as evidence of the legislative intent. If it were discovered that the statute sought to be enforced herein was in contravention of the constitution, the necessary result of such conclusion would be the dismissal of the petition. But whether the legislature can constitutionally burden railroad corporations by imposing higher taxes upon them than upon other owners of property throughout the state, or whether they may without violation of the organic law relieve them by a special exemption from the whole or a part of the taxes generally assessed upon property, need not be considered. Judicial decisions in view of which existing legislation upon the subject was originally adopted and subsequently re-enacted establish a legislative intent to treat railroads, for the purpose of taxation, as individuals taxable for the true value of their property at the rate at which other property is taxed in the same taxing district, and exclude any purpose to tax them " for a greater sum than their proportionate and equal share with the other property in the state, ascertained as nearly as it reasonably could be." *Boston & Maine R. R.* v. *State*, 63 N. H. 571, 572; *Boston etc. R. R.* v. *State*, 60 N. H. 87; *Atlantic etc. R. R.* v. *State*, 60 N. H. 133; *Cheshire County Tel. Co.* v. *State*, 63 N. H. 167; *Western Union Tel. Co.* v. *State*, 64 N. H. 265.

The state board of equalization, upon whom the duty of assessing taxes upon railroads is placed, are required to "determine the value of the property to be taxed . . . and the rate of taxa-

tion." P. S., c. 63, s. 3 ; *Ib.*, c. 64, s. 4. In the performance of this duty, it is alleged that the board added together the taxes assessed and collected by municipal officers, those assessed and collected upon unincorporated places by state and county officers, and those collected by the state treasurer upon savings bank deposits, the capital stock of building and loan associations, and insurance companies, and obtained the average rate of taxation by dividing the total amount of such taxes by the total of the select-men's inventories, the valuation of unincorporated places, the savings bank deposits, and the building and loan and insurance capital. They then assessed the railroads of the state at the rate which in this way they found all other property in the state was assessed.

If one person owned all the property in the state except the railroads, although he paid taxes at different rates upon different portions of it, the average rate of the taxation of the whole would be obtained by the division of the total tax by the total amount of property upon which the several sums were levied. As between two persons, one owning all the railroads and the other owning all the other taxable property in the state, the taxation of the total property of each at the same rate would produce the equal division of public expense required by the constitution. As the taxation of all other property in the state at the same rate as railroads are taxed would produce in the aggregate the sum levied by varying rates on different classes or parcels of property, the owner of the whole could not complain that he paid too much, or the railroad owner too little, because each would pay the same. As the property in the state is divided among many, who hold the different classes of property in varying ratios, it follows that, as between certain individuals and railroads generally, some individuals will pay more and some less than is paid on the same value of railroad property. But so long as railroads pay upon their property the same amount as is paid on the average throughout the state upon that amount of property, their share of the public burden is borne by them. This is the rule applied in tax appeals from local assessors. *Amoskeag Mfg. Co.* v. *Manchester*, 70 N. H. 200. As the method adopted by the board in assessing railroad taxes assesses upon the $28,000,000 of railroad property (the appraisal of which is not in question in this case) the same amount in taxes as is assessed upon the average upon each $28,000,000 of property throughout the state, the result complies with. the constitutional rule of equality in taxation, which "requires that throughout the same taxing district the same tax shall be laid upon the same amount of property." *Amoskeag Mfg. Co.* v. *Manchester*, 70 N. H. 336, 344. As the method of the board is apparently mathemati-

cally proportional and constitutionally just, the only ground upon which the result can be attacked is that some one or more of the taxes considered by them in finding the average is not a tax upon property and cannot be considered in the distribution of the burden of taxation placed upon property. *Amoskeag Mfg. Co.* v. *Manchester,* 70 N. H. 336.

The plaintiff contends that the tax upon savings bank deposits, building and loan associations, and insurance capital should not be considered. It is not suggested that the tax on building and loan associations stands any differently from the tax on savings bank deposits. So far, however, as the consideration of the tax upon insurance capital is concerned in this case, the question is purely academic. The tax is so inconsiderable as not to affect the result. Considering it, the exact arithmetical average is a small fraction of a cent less than the rate ($1.72) found by the board. Excluding it, the same rate is a similar fraction more than $1.72. In either event it cannot be held that the rate found by the board is not the average rate "ascertained as nearly as it reasonably could be." *Boston & Maine R. R.* v. *State,* 63 N. H. 571, 572. The substantial question is as to the savings bank tax.

The plaintiff's contention is, that the tax levied with reference to some $66,000,000 of what the board considered property, owned by 183,243 depositors,—nearly one half the population of the state,—should be excluded from the computation, and the tax be determined by the rate upon the remaining $238,000,000, *i. e.*, that more than one fifth of the whole property taxed should be omitted from the calculation. Upon the concession of the plaintiff as to the power of the legislature, the question appears to be, as stated at the outset, purely one of statutory construction. Giving to the language of the section its ordinary meaning, the only question raised by the plaintiff's contention, that the sum collected by the state from savings banks should not be included in computing "the average rate of taxation . . . upon other property throughout the state," is whether the sum so collected is a tax "upon other property throughout the state." As there is no contention that this sum so collected is not a tax of some sort, or that it is not exacted "throughout the state," the question is whether the savings bank tax is a tax upon property. As the question is the meaning of the statute,—what the legislature intended by the words used,—the exact point in issue is much narrower, and is: Was the savings bank tax understood by the legislature, in 1891, to be a tax upon property?

Savings banks, under provisions of the Public Statutes enacted contemporaneously with the section under consideration, are required to pay taxes in two ways. They are taxed for all real

estate owned by them in the towns where it is situate, precisely as all other individuals and corporations, except railroad, telegraph, and telephone companies, who are not so taxed for real estate used in their ordinary business. P. S., *c.* 64, *s.* 12.  This is conceded to be a property tax.  The tax which is collected by the state treasurer is not based upon property owned by the corporation; it is determined by the amount the bank owes its depositors.  Section 5, chapter 65, Public Statutes, requires the payment of " one per cent upon the amount of the general and special deposits on which it [the bank] pays interest."  The tax is laid upon the depositors' interest, and not upon the property of the bank.  The property of the bank, except real estate, the value of which is deducted from the amount of the deposits taxed, is not taxed. P. S., *c.* 65, *s.* 12; *Laconia Savings Bank* v. *Laconia,* 67 N. H. 324.

From the manner in which the tax is determined, it can be argued with great force that this tax is not a tax upon property of savings banks.  It is so declared in effect in the statute and has always been so understood.  But because it is not a tax upon property of the bank, it does not follow it is not a property tax. It is a tax upon the amounts entrusted to the bank by the several depositors.  The question therefore is: Was a deposit in a savings bank commonly understood to be property in 1891?  For the legislature, in the absence of evidence that the terms employed in a statute have attained a peculiar significance in the law, must be understood to have employed the words in a statute with the meaning ordinarily attached to them.  The legislature has directed that the words of a statute should be so construed. P. S., *c.* 2, *s.* 2. It cannot be claimed that deposits in savings banks are not commonly understood to be property.  But it is not necessary to rely upon common understanding.  That they are property is the foundation upon which the following decisions rest: *Mann* v. *Carter, ante,* 345, 351; *Robinson* v. *Dover,* 59 N. H. 521; *Berry* v. *Windham,* 59 N. H. 288.  The only possible basis for doubt as to the meaning of the plain terms of the statute is confusion as to the nature of the tax under consideration.  If the tax is upon the deposits and against the depositors, in effect if not in form it is a tax upon property.  If it is a tax against the banks merely as corporations, as has been suggested, it can be argued with force that it is not a property tax.  The views that have heretofore been held by the court as to the nature of this tax may be incorrect.  It may be true that since 1903 a governmental exaction which is not taxation in the sense in which that subject was before that time understood in this state, and which is " an application of property for public charges, but not a proportional division of

public expense," is now permissible. *Thompson* v. *Kidder, ante,* 89, 94.

But neither of these considerations is now material. The legislature cannot be presumed to have known, in 1891, that the constitution would be amended in 1903, or that the judicial declarations as to the nature and character of the tax, then unquestioned, would subsequently be doubted. The statute must be read in the light of the circumstances then existing: the constitution as it was then written, and the law as it was then declared. Under the constitution as it existed and was interpreted from 1784 to 1903, the only subjects of taxation were polls and estates. *Curry* v. *Spencer*, 61 N. H. 624. As the savings bank tax is plainly not a poll tax, it must have been regarded as a property tax unless it was understood to be supported, not as an act of taxation, but as an encouraging or discouraging exercise of the protective power. *State* v. *Express Co.*, 60 N. H. 219, 260, 263. Whether the tax was one or the other was the question directly raised and decided in *Bartlett* v. *Carter*, 59 N. H. 105; while in *Rockingham Ten Cent Savings Bank* v. *Portsmouth*, 52 N. H. 17, 27, 28, the present tax is expressly distinguished from the one half of one per cent on the amount of the capital stock which banks with a capital were formerly required to pay for the benefit of the literary fund (G. S., c. 85, s. 1; R. S., c. 75, s. 1), which Judge *Perley*, in *Nashua Savings Bank* v. *Nashua*, 46 N. H. 389, 399, says " is not named or assessed as a tax,  .  .  .  and has more the character of a bonus voluntarily paid for the right to exercise the privilege of banking, than of an ordinary tax."

*Bartlett* v. *Carter* was decided in 1879. The provision therein construed was re-enacted in 1891 (P. S., c. 65, s. 5) without change. Applying the familiar rule, that the re-enactment of a statute without change is, in the absence of weighty evidence to the contrary, an adoption of previous judicial construction, we have a legislative declaration that the tax in question is intended as a tax upon the property of the depositors, and not as a privilege tax against the bank. That no different understanding was had of this tax by the legislature in 1891 has also been decided by this court. *Petition of Savings Bank*, 68 N. H. 384, 386. That the tax differs in method of collection and rate from that on " other property " is expressly recognized by the court; but with those differences in mind, the tax, upon the ground of its history and purpose and the adjudications as to that effect, was unanimously declared to be a tax upon property. By common understanding and repeated judicial definition adopted by the legislative re-enactment of the statute, the tax whose consideration by the board of equalization in determining the average rate of taxation

upon property throughout the state is attacked was in 1891 established as a tax upon property, and as such comes within the plain terms of the statute. It may be that by overruling *Mann* v. *Carter, ante*, 345, *Petition of Savings Bank*, 68 N. H. 384, *Robinson* v. *Dover*, 59 N. H. 521, *Berry* v. *Windham*, 59 N. H. 288, *Bartlett* v. *Carter*, 59 N. H. 105, and *Rockingham Ten Cent Savings Bank* v. *Portsmouth*, 52 N. H. 17, and by rejecting all reference to the history of the legislation and the language of the original act, in which the tax is described as a tax " on the depositors " (Laws 1864, *c.* 4028), it can now be held that this tax is not a property tax, but is a privilege tax. It may be that the authorities cited in *Bartlett* v. *Carter* from other jurisdictions, and upon consideration then rejected as inapplicable here, ought now to be followed. If all this be conceded, the conclusion, if adopted, can have no weight upon the question before the court; for there is no evidence that in 1891 the soundness of the judicial conclusion that this tax was a property tax had ever been questioned. There is direct evidence to the contrary. *Petition of Savings Bank*, 68 N. H. 384.

It may even be conceded that scientific study of the subject of taxation has developed that constitutional provisions for the division of the expense of government, by taking annually for that purpose a proportionate part of his property from each individual according to its value, does not equally distribute the burden, either in proportion to the ability of each to pay or in fair return for benefits received. *Thompson* v. *Kidder, ante*, 89, 92. Even if it could be held that the particular directions of the constitution as to the method of taxation might be controlled by general principles of equality of right contained therein (*State* v. *Express Co.*, 60 N. H. 219, 247, 250, 255), such conclusions would not aid in the interpretation of a statute enacted at a time when the constitutional rule was universally understood to be equitable and just. *Amoskeag Mfg. Co.* v. *Manchester*, 70 N. H. 336, 344.

It is said that the provision of the Public Statutes discussed is a re-enactment, without intent to change the meaning, of the act of 1881 (*c.* 53), and that the language of this act excluded the savings bank tax. In support of this conclusion, the practice of the court in assessing the tax under a prior statute somewhat similar in terms is relied upon. Consideration of this contention necessitates a reference to the history of railroad taxation and an examination of the earlier statutes relating to the subject—a proceeding always competent and often of great value in the attempt to ascertain the meaning of a particular enactment.

. Prior to the Revised Statutes (1842), there were no special provisions for railroad taxation. Railroad stock, like bank stock, was taxable to the owner in the town in which he resided. Laws

1833, c. 108, ss. 1, 2; *Pittsfield* v. *Exeter*, 69 N. H. 336. By the Revised Statutes, a special annual tax of one per cent was imposed upon the value of that part of the capital stock of each railroad expended in this state, to be determined by the certificate of the justices of the superior court, to be paid to the state treasurer and by him distributed, one-fourth to the towns in which the railroad was located in proportion to the capital stock expended therein for buildings and right of way, three-fourths to the towns in which the stockholders resided in proportion to the amount of stock owned in each town, the balance, or the proportion owned by non-resident stockholders, to be retained by the state. R. S., c. 39, ss. 4, 5. Before any tax was assessed at the one per cent rate of the Revised Statutes, the act was amended so that it required the assessment of the tax to be "in proportion, as near as may be, to the taxation of other property on the first day of April . . . in the several towns in which said railroads are situate." Laws 1843, c. 34, ss. 2, 4. This scheme of taxation, modified only as to the method of assessment and by the provision taxing real estate not used in the ordinary business of the roads and the ten years' exemption, is still in force. *Pittsfield* v. *Exeter, supra;* P. S., c. 64, ss. 1, 2, 4, 12, 13, 15. In the General Statutes of 1867, the subject of taxation was described as the "capital" instead of the "capital stock" of the railroad, and the actual present value of the capital of any railroad expended in this state was required to be determined by the justices of the supreme court. G. S., c. 57, ss. 1, 2. The tax commission of 1878, as a result of their investigations, reported to the legislature sundry bills, one of which created the board of equalization, and another made new provisions as to railroad taxation. The action of the legislature upon these recommendations established the board of equalization, one of whose duties was to assess the taxes upon the several railroads (Laws 1878, c. 73; G. L., c. 61), and laid down new rules for the taxation of railroads. "Every railroad corporation in this state not exempted from taxation . . . shall pay to the state an annual tax upon the actual value of the road, rolling stock, and equipments on the first day of April of each year, as near as may be in proportion to the taxation of other property in April in each year, in the several towns and cities in which such railroad is located, to be distributed according to existing laws." Laws 1878, c. 70, s. 1; G. L., c. 62, s. 1.

While there are no reported cases disclosing the methods of the prior assessment by the justices, it seems to be established with reasonable certainty that they assessed the tax as a municipal tax of the railroad towns,—that they took no account of the change in 1865 in the method of assessing the tax upon savings bank de-

posits; and it was claimed by counsel for the state, in *Boston etc. R. R.* v. *State*, 60 N. H. 87, that undervaluation of the property in towns for taxation was not considered in making the assessment. In 1879 the board of equalization followed the course that had been pursued by the justices for thirty-six years. They assessed the tax as a municipal tax of railroad towns, paid no attention to the savings bank tax, and did not take into consideration the undervaluation of other property. As the tax rate was not the same in all railroad towns, this action taxed the several railroads at different rates, as must have been the case for thirty-six years before. The act creating the board of equalization provided for an appeal to the supreme court, after the manner of the appeal from the selectmen's assessment, by any one aggrieved. Laws 1878, c. 73, s. 9; G. L., c. 61, s. 9; *Ib.*, c. 57, s. 12; *Boston etc. R. R.* v. *State*, 60 N. H. 87, 94.

The Boston, Concord & Montreal Railroad appealed from the assessment made against them in 1879, alleging as grievances overvaluation, lack of proportion because of the failure to take into consideration the undervaluation of property by the local assessors, and the lack of uniformity in the assessment of the different railroads. The case was heard by referees, who found the value of the railroad, assessed the tax according to the rate in the railroad towns, but reduced the rate in the proportion in which they found other property was undervalued by the selectmen. The questions presented to the court upon this report were the validity of the assessment at the average rate of taxation in the towns in which the railroad was located and the action of the referees in considering the undervaluation of other property. In support of their contentions, counsel for the state relied upon the uniform practice of the justices in assessing the tax as a municipal tax of the railroad towns and in refusing to consider undervaluation of other property. It is held in the case, solely upon the manner in which the tax was distributed (as to which no change had been made in the law since 1842), that the railroad tax was not a town tax, was not assessable in proportion to the taxation of other property in the towns in which the railroad was located, and that it was "either a state tax, or a tax of a triple character, partly state, partly municipal in respect to the railroad towns, and partly municipal in respect to the stockholders' towns"; and the reduction on account of the undervaluation of other property was approved. The referees were instructed to find the facts necessary to be known if the tax were a state tax, or if either party claimed it was partly municipal. The subsequent history of the case shows that neither party claimed anything on account of the municipal character of the tax, and the case was

disposed of upon the theory that the tax was a state tax. The assessment of the referees in proportion to the taxation in railroad towns was set aside, upon the ground that, so far as the tax was a state tax, to be held valid it " must be proportional with the tax of other property throughout the state." *Boston etc. R. R.* v. *State*, 60 N. H. 87, 96, 97.

Although this decision overturned the practice of the court for over a generation, it was not deemed necessary in the opinion to refer to that practice, or to consider the argument of the state based thereon. The former practice of the court, apparently regarded as of no weight at all upon the two questions presented by that case, is not entitled to serious consideration upon the question now presented. The case well illustrates the little weight as a precedent attached to decisions upon questions which may have been involved, but which were not presented to or considered by the court. This case contains no reference to the savings bank tax, although the language of the court, that the tax if a state tax " must be proportional with the tax of other property throughout the state,"—an expression which it is not probable was used in entire forgetfulness of the decision a year before in *Bartlett* v. *Carter*,—includes that tax unless some ground for exception can be found; but the particular question does not appear to have been presented, and it cannot fairly be said to have been decided, though embraced within the languge used. Why the question now presented was not raised in that case, or the change heeded by the court in 1865, may not be very material. It should be borne in mind, however, that the practical question differs greatly today, when the taxable savings bank deposits have increased to $66,000,000 and the difference in rate has also been augmented by the increase in the municipal rate, while the bank rate is less than in 1879.

The act of 1864 taxing savings bank deposits was not passed, as has been assumed in argument, to encourage such deposits by a special method of taxation; but its purpose was to secure the taxation of such accumulations, which under existing law were largely escaping taxation. The existing method of taxing railroad corporations furnished the pattern followed. Robinson Hist. Taxation in N. H. 116, 117 ; Laws 1864, *c.* 2873 ; Laws 1861, *c.* 2493 ; R. S., *c.* 39, *s.* 3; *Nashua Savings Bank* v. *Nashua*, 46 N. H. 389, 394, 396. While if, prior to 1864, all deposits in savings banks had been taxed at the local rate in towns the change then made would have decreased the taxes received therefrom, the facts that deposits of non-residents were not taxed at all, that deposits under $300 were not taxed,—the average deposit being less than $200

(Bank Comm'rs' Rep. 1864),—and that depositors could offset money on which they paid interest, practically exempted nearly all deposits. The result of the law was to tax property not before taxed and to furnish additional revenue to towns. Any computation based on the assumption that, but for the legislation of 1864, all deposits of taxpayers in towns would have been taxed at the local rate, is without basis in fact and misleading. The argument based upon the claim of partial exemption,—that because the legislature, under the practical construction given the constitution, have the power to select the subjects of taxation and thereby exempt classes of property not named (*Canaan* v. *Enfield District*, *ante*, 517), they can limit the proportion to be paid by particular property,—is equally unfounded in law, as has been recently held in Massachusetts. *Opinion of the Justices*, (Mass.) 84 N. E. Rep. 499.

The court, in 1880, having declared the provisions for railroad taxation to be in conflict with the constitution, the legislature at the next session repealed the provisions requiring every railroad corporation to pay " an annual tax as near as may be in proportion to the taxation of other property in the several towns and cities in which such railroad is located," and amended the section so " as to require every such railroad corporation to pay an annual tax as near as may be in proportion to the taxation of other property in all the cities and towns of the state." Laws 1881, *c.* 53. The occasion of the statute was the decision above referred to. Its purpose was to bring the statute within the constitutional requirements announced by the court, that such tax as a state tax "must be proportional with the tax of other property throughout the state." *Boston etc. R. R.* v. *State*, 60 N. H. 87, 96. The form used to express this purpose was probably suggested by the act for the taxation of railroads proposed by the tax commission of 1878. Tax Comm'rs' Rep. 175. That the language was understood to have the meaning of that used by the court appears from a note on page 95 of that case: "By *c.* 53, Laws of 1881, the tax is assessable in proportion to the taxation of other property throughout the state." This note must be chargeable either to Judge Ladd, the reporter, or to Chief Justice *Doe*, the author of the opinion. As the view of either, the note is evidence of weight that the language of the act of 1881 was understood to have the meaning of the language used in the revision of 1891.

But there is other evidence. By chapter 54, Laws 1878, telegraph companies were required to pay a tax of one per cent annually upon the value of their lines, to be appraised by the board of equalization. G. L., *c.* 62, *s.* 14. By section 2 of chapter 53, Laws 1881, above referred to, the provision for the taxation of

telegraph companies was amended so as to require them to "pay an annual tax as near as may be in proportion to the taxation of other property throughout the state, upon the value" of their property made taxable by the statute; and the board were required " to assess said telegraph property at the average rate of taxation of other property throughout the state." The two forms of expression are used in the same act. There is no ground for holding that the legislature intended to, or understood that they could, apply a different rule in the taxation of railroads from that by which they provided telegraph companies should be taxed. It must be concluded that the two expressions had exactly the same meaning. The latter is the form used by the court in the decision from which the legislation resulted. If the reference to cities and towns in section 1 would authorize the conclusion that only property taxed by city and town officers was referred to, the language is broad enough to include all property taxed in cities and towns, whether the tax is collected by municipal or state officers. As the expression used in section 2 of the act contains no terms implying a restriction to taxes collected by municipal officers, it follows that the terms of section 1 having the same meaning were not intended to be so restricted. Telephone companies, in 1883 (Laws 1883, c. 110), were required to "pay an annual tax, as near as may be in proportion to the taxation of other property throughout the state," and the board of equalization were directed to assess their property "at the average rate of taxation of other property throughout the state." In 1891, the commissioners in preparing the Public Statutes adopted the language found in the opinion of the court in 60 N. H. 87, and in the statutes taxing telegraph and telephone companies "throughout the state" in place of "in all cities and towns of the state" (P. S., c. 64, s. 1), indicating in the margin that the change was not intended to alter the meaning. The only possible reason for the change was the belief that the new language expressed more correctly, with less liability to misunderstanding, the meaning of the old. If a meaning can be deduced from the old which is not fairly attributable to the new, it does not follow that this meaning should be ascribed to the new, but the new language is evidence of the meaning of the old.

It is urged that the question now raised was decided in accordance with the plaintiff's contention in *Boston etc. R. R.* v. *State*, 62 N. H. 648. If this claim be correct, a peculiar and extraordinary situation is developed. The case was decided in June, 1883, and does not appear to have been forgotten or overlooked. It is cited 68 N. H. 386, 403, 510, and 69 N. H. 33. The court having held, in June, 1880 (*Boston etc. R. R.* v. *State*, 60 N. H. 87),

that the railroad tax could not constitutionally be assessed in accordance with the terms of the existing statute, the legislature at the next session changed the statute to accord with the view of the court.    Laws 1881, .c. 53.    Immediately after the decision was announced, it appearing to be conceded as the result of that case that the railroad tax was a state tax, the board of equalization voted to so assess it; and the court having said that as a state tax the tax "must be proportional with the tax of other property throughout the state," and having recently held in cases before referred to that the saving bank tax was a tax upon property, the board included the deposits and the tax upon them in computing the average tax upon property throughout the state.    The tax has been so assessed annually ever since, without objection from any quarter until very recently.    If the decision relied upon introduced an exception into the statute, the legislature took no steps to make the written law conform to the judicial decision, and the exception has never been recognized in the execution of the law.    Since that decision was announced, numerous tax appeals by railroad, telegraph, and telephone companies have been determined, some of which have been before the court on questions of law and are to be found in the reports, in which abatements were granted, which would have been much less in amount or entirely denied if the law as it is claimed it was decided in 1883 had been relied upon and applied.    *Boston & Maine R. R.* v. *State*, 63 N. H. 571; *Western Union Tel. Co.* v. *State*, 64 N. H. 265; *Boston etc. R. R.* v. *State*, 64 N. H. 490.    Counsel for the state have acquiesced in the contrary view, and the attorney-general has officially advised against the plaintiff's contention.    Although railroad taxation has been the subject of public discussion, no one claimed the case in question to be an authority against the method followed by the board of equalization, until they called the attention of the legislature to the decision in their report for 1906.    It is not to be presumed that all these public officers would have failed to heed the opinion of the court if they had understood such a decision had been made.    It seems probable that the court, if they were aware the question had been decided by them, would have called attention to it in some of the subsequent cases, although the question was not directly raised.    The only reasonable conclusion from the indisputable facts is that no one connected with the assessment of the tax or the conduct of the tax appeals understood the decision to be what the plaintiff claims; and if these persons did not have that understanding, the only probable inference that can be drawn is that no such decision was in fact made.    Examination of the opinion in the light of the questions presented leads to the same conclusion.

The fundamental question is what did the case decide, not what is arguable from the language of the opinion. The language of an opinion, like that of all written documents, must be read in the light of the circumstances under which it is used. "Serious misapprehension of the scope and effect of a judicial opinion is often likely to occur, if the exact point in issue is disregarded." *Hedding* v. *Gallagher*, 72 N. H. 377, 391; *Richardson* v. *Mellish*, 2 Bing. 229, 252; *Quinn* v. *Leathem*, [1901] App. Cas. 495, 506; 26 Am. & Eng. Enc. Law 169, 170. In plain terms, to ascertain what a judge meant by what he said it is necessary to know what he was talking about. The report of the case is brief. It is said to be an appeal from the assessment of the plaintiffs' tax of 1880, and that the facts were found by referees; but there is no statement of the facts found and no order for the disposition of the case. It is therefore impossible to determine from the printed volume what facts were before the court, or what effect the court thought the legal principles announced had upon those facts, further than both may be inferred from the language of the opinion, which, so far as it is claimed to relate to the present controversy, is as follows: "By the act of 1878 (G. L., *c.* 62, *s.* 1) and the act of 1881 (*c.* 53), railroads are taxed 'as near as may be in proportion to the taxation of other property' in towns and cities. The savings bank tax (G. L., *c.* 65, *s.* 8) is an anomaly, resting on peculiar grounds of public policy, and is universally understood to have acquired the position of an exception to the constitutional rule of equality. It is so regarded in the assessment of state, county, and town taxes upon unincorporated persons, and in their tax appeals; and the plaintiffs' charter is not a statutory or a constitutional ground of exemption." This is all there is by way of statement, argument, illustration, or conclusion. What was in fact decided must depend on the question presented. If the language was used in answer to, or in decision of, the question now raised by the plaintiff, the meaning might be tolerably clear and constitute such a judgment as he contends for. The inquiry, therefore, is whether this or some other question was in the mind of the court at the time.

The referees' report and briefs of counsel are accessible in 148 Briefs and Cases 321, *et seq.* The files of the court contain the report and the written motion of counsel setting forth the legal questions raised upon the facts found. The report sets out in detail the method adopted by the board of equalization to ascertain the average rate of taxation, including the savings bank deposits. This the board found to be $1.44 on each $100 of valuation; but upon the ground of the undervaluation of other property, they found railroads should be taxed at the rate of $1.25. The referees

found the value of the road, reducing the appraisal of the board, and found that property included in the selectmen's inventories was taxed at the rate of $1.52 on the appraisal, but was appraised at only 73.6 per cent of its value. They also found that a tax should have been assessed at the rate of $1.52 upon 73.6 per cent of the valuation found by them. This produced the same result as assessing the tax upon the true value at 73.6 per cent of $1.52, or $1.11872,—the method of the board.

Upon the filing of this report, counsel for the plaintiffs moved for judgment on the report in the following manner: (1) That the tax be wholly abated for the reason that the statute under which it was assessed was unconstitutional; (2) that, failing the sustaining of this contention, the tax be assessed at one per cent of .763 per cent of the actual value of the road as found by the referees, or (3) at one per cent of the actual value. In his printed brief counsel states his position as to the assessment in controversy, as follows: " Can said assessment be sustained by reason of the fact that a smaller tax was imposed upon the deposits in savings banks?" The position was taken, not as an attack upon the findings or rulings of the referees as to what the tax should be, but the attack was upon " the assessment of 1880." The position taken was, that the savings bank tax and the railroad tax, being both state taxes, must be uniform, and no higher tax could be assessed on railroads than upon the deposits. As counsel say in their brief: " When the legislature has only $42,000,000 [the total appraisal of railroads and deposits] of property on which to lay a tax, if they make that tax one per cent on two thirds of the property [the bank deposits] and 1.52 per cent on the remaining one third [the railroads], they undertake to do with respect to the remaining one third what they are prohibited from doing by the constitution of the state." The claim in effect was, that the savings bank tax only could be considered in finding the average rate of taxation upon property throughout the state. Whether the tax upon deposits should be considered in connection with all other property and taxation in the state in determining the average rate of taxation, the court were not asked to decide. The propriety of so including it was apparently conceded, as counsel for the state took the position that such consideration was all the constitution demanded or the plaintiffs could ask. The plaintiffs claimed more, and the denial of their contentions was a decision that constitutional equality did not require that railroads should be taxed at the same rate as savings banks; that in ascertaining the rate it was not necessary to exclude all property and taxes except savings bank deposits and the tax upon them. The substance of what was said was, that as taxes upon other property are assessed at

a higher rate than savings bank deposits, the railroads are not wronged if their property is so taxed. How the average rate should be determined, or the validity of the assessment made by the referees, did not arise upon the motions presented to the court, was not discussed, and consequently was not decided. Limiting the decision to the question presented, the subsequent action in reference to railroad taxation, otherwise inexplicable, is readily understood. The record contains no decree of abatement, and reference has been made to a settlement made by the parties with the state treasurer in 1888. From the amount paid on the execution it can be inferred what the parties understood the judgment was, and their understanding may be considered correct. The proposition, however, that from the amount paid and accepted it must be inferred that legal questions not disclosed by the record were presented to and considered by the court, does not require answer. If there had been a judgment of abatement greater than the amount allowed by the referees by the sum which consideration of the tax on deposits would affect the result, there would be evidence that the claim was made and either assented to by the state or decided for the plaintiffs; but a judgment for the amount found by the referees furnishes no evidence that the question was considered by the court or the parties, because the abatement must have been the same if the question was not considered at all, as it would have been if decided adversely to the plaintiffs.

An attempt is made, by assuming that, if the tax upon deposits were considered, the rate upon the valuation found by the referees would be $1.44 instead of $1.52, to show that the consideration of that tax would have materially affected the result, as a foundation for the argument that the question must have been raised and considered. But the referees did not find what the rate or valuation should be, considering only the taxation of the property included in the inventories and the deposits, although both may be computed from the facts found. The rate of $1.44, which the referees say was found by the board of equalization, is the average rate only upon the assumption that the property in the inventories was appraised at its full value, as were the bank deposits. It is apparent that the greater the undervaluation of the inventories, the nearer the tax of that property at $1.52 and of deposits at one per cent approach each other. Property taxed at $1.52 upon 65.79 per cent of its true value would produce the same tax if taxed at one per cent upon its full value. If the undervaluation found to be 73.6 had been 7.8 per cent greater, the tax of both classes would have been equal. In this case consideration of the tax upon deposits would have reduced the rate upon the true value of the railroad property from $1.11872 to $1.1035, and the

rate upon the reduced valuation from $1.52 to $1.50 approximately. The plaintiffs' tax would have been approximately $279.68, exactly $288.61 less. But the valuation to which the plaintiffs were entitled upon their petition for abatement was one at the same ratio to its true value as that of all other property taxed. *Amoskeag Mfg. Co.* v. *Manchester*, 70 N. H. 200. The valuation of polls should not be considered in determining the ratio. *Amoskeag Mfg. Co.* v. *Manchester*, 70 N. H. 336. The finding of the referees was: "The property included in said inventory, excluding polls and money, was valued for taxation at 70 per cent of its actual value. The entire property in said inventories, including polls and money, was valued for taxation at 73.6 per cent of its actual value." Taking account of the taxation of deposits at a less rate, the referees further found that "the property included in the town inventories, the railroads (exclusive of the B. C. & M. [the plaintiffs]), and the savings bank deposits, taken together, were valued for taxation in 1880 at 74 per cent of their actual value." Upon these findings the questions decided in each of the Amoskeag cases, as to the comparison of the valuation of the plaintiffs' property with all other property taxed instead of with like property of individual taxpayers, and the exclusion of the poll taxes from the computation, might have been raised. If judgment was rendered sustaining the tax found by the referees, it does not follow that the court considered these questions and decided each of them adversely to the result reached when they were raised. Why the state did not ask for an assessment upon the basis of all other taxed property; why the plaintiffs did not ask for an assessment including the deposits and excluding other railroad property, or for the exclusion of the poll taxes in determining the rate of property undervaluation; or why, in the settlement of 1888, the state permitted the abatement upon the tax of 1881 to be applied upon the tax of 1880 after the court had expressly decided such application could not be made (64 N. H. 490), so that the whole amount paid in the settlement was less than was due if deduction were made on account of the tax on deposits, is mere matter of speculation. The answers to these questions are immaterial. Any reason for failure to raise the questions would not show that the questions, or any of them, were considered and decided.

The case fails as an authority in the present controversy because it does not appear that any further questions of law as to what the tax should be were ever presented to the court or decided. The case stands precisely like *Boston etc. R. R.* v. *State*, an appeal from the tax of 1881, reported on a minor point in 64 N. H. 490 (December, 1887), in which an abatement was granted on the basis of the board rate, as it was found upon the evidence

presented, though the mistake of calling it $1.40 instead of $1.46 was made.    The abatement was a considerable sum ($2,331.10); while if the rate had been computed excluding the savings bank deposits, no abatement could have been granted, because a tax assessed at that rate on the valuation found by Judge *Smith* would have exceeded the tax appealed from.    This is not a decision against the plaintiff, because the question was not presented or decided.    For the same reason, *Boston etc. R. R.* v. *State*, 62 N. H. 648, is not a precedent in his favor.    The question must be held to be an open one, now for the first time raised.    If there were doubt as to whether the question was decided in 1883 as claimed, the subsequent history of the case and the twenty-four years' acquiescence in an opposite interpretation would forbid a decision today upon its authority alone, and would require a re-examination of the question.    The only value of the case would be the weight and application of the arguments advanced in the opinion.    To such consideration it is entitled under the opposite conclusion.

Relying upon his construction of the decision in 1883 (*Boston etc. R. R.* v. *State*, 62 N. H. 648), the plaintiff contends that the re-enactment of the statute is an adoption of the meaning given to it by the court.    If it were to be conceded for the purpose of the argument that the plaintiff's interpretation of the decision is correct, the rule invoked would have no weight in the present inquiry.    Technically, it does not apply because the tax involved in that case was assessed under the act of 1878 (as construed in *Boston etc. R. R.* v. *State*, 60 N. H. 87), which was repealed in 1881.    The decision did not and could not constitute an adjudication of the meaning of the act of 1881, passed a year later.    The only reason which sustains the rule is the inference that the legislature, knowing the meaning attached to the language by the court, would have changed the language if a different purpose were intended.    From the knowledge of the legislature, actual or presumed, the rule derives its sole force.    The entire ignorance of every one connected with tax administration of the rule claimed to have been established in 1883 has already been referred to.    It cannot fairly be inferred that the legislature in 1891 had knowledge not possessed by the state assessors, counsel for the state, or members of the court.    It has been said by the federal supreme court, "that when the meaning of a statute is doubtful, great weight should be given to the construction placed upon it by the department charged with its execution. . . . And . . . that the re-enactment by congress, without change, of a statute which had previously received long continued executive construction, is an adoption by congress of such construction." *United*

*States* v. *Hermanos*, 28 Sup. Ct. Rep. 532; *Robertson* v. *Downing*, 127 U. S. 607; *United States* v. *Healey*, 160 U. S. 136; *United States* v. *Falk*, 204 U. S. 143, 152. This statute has received but one construction from the officers of the state charged with its execution, since in effect it was formulated by the court in 1880 and enacted by the legislature in 1881.

The interpretation put upon the statute by the board of equalization is therefore supported by the fact that, so assessed, the burden placed upon railroad property is its constitutional and equal share compared with that placed upon all other property in the state; by the language of the court in *Boston etc. R. R.* v. *State*, 60 N. H. 87, practically enacted into the statute; by the decision in *Boston & Maine R. R.* v. *State*, 63 N. H. 571, that railroads cannot be lawfully compelled to pay more; by the plain terms of the statute, defined by repeated decisions of the court, subsequently re-enacted without change; by the uniform practice for twenty-seven years; by the re-enactment of the statute in the light of such practice; and by the use of similar language by the legislature of 1907, when the question was matter of public discussion and had been fully presented to the legislature by the board in their report for 1906, with the suggestion that the matter of a change in method was a subject for legislative action. The meaning of the words "at a rate as nearly equal as may be to the average rate of taxation . . . upon other property throughout the state," in chapters 81 and 91, Laws 1907, cannot be questioned under these circumstances; and it is equally plain it was intended that the taxes thereby provided for upon express companies, sleeping, dining, and parlor cars should be determined as railroad taxes had been, and that both should be taxed the same. It is unnecessary to refer to the failure of the legislature to change the law when the subject was before them in 1907. The only evidence upon the other side is the action of the court from 1865 to 1878, which was repudiated and disapproved when it was before urged as authority, and the reasoning of the opinion in *Boston etc. R. R.* v. *State*, 62 N. H. 648.

If the savings bank tax is an anomaly to the extent that other property holders may not claim that their property cannot be taxed at a different rate, the effect of the anomaly cannot be extended beyond the acquiescence which created it. As there has been no acquiescence in the exclusion of the bank taxes in ascertaining the average rate of taxation throughout the state for the purpose of imposing a uniform tax upon railroads, but the reverse, there is no ground for the contention that such an exception to the constitutional rule of equality has been created by universal understanding. If the assessments, from 1865 to 1880, of a municipal

tax upon railroads, without objection, amended the constitution in this regard, the amendment, if it could apply to a tax assessed as a state tax, has been repealed by the contrary action for twenty-seven years. The reason why the discrimination, if one exists, is not regarded in the taxation of unincorporated persons and in their tax appeals, if it cannot be, may be determined when such question arises. The fact that no unincorporated person has raised the question, and that it has not been decided, is not conclusive against the incorporated person who first raises it.

Reliance is also placed upon some expressions culled from opinions of Chief Justice *Doe* in tax cases. In *State* v. *Express Co.*, 60 N. H. 219, he said: "There can be no proportion or equality between that which is fixed and that which is uncertain and fluctuating." The truth of the quotation relied upon is as self-evident as a preliminary axiom in Euclid. Things that are not equal are unequal. The axiom was relied upon by Judge *Doe* to sustain the unconstitutionality of the fixed tax upon railroad expressmen, which was in issue in that case. Its only bearing in this case is to cast doubt upon the constitutionality of the savings bank tax, which is not now in issue. There would be no difficulty in mathematics or logic in assessing a tax upon railroads in proportion to the tax upon savings banks. So long as that tax only were considered, the two taxes would be the same. But it has not been claimed since 1883 (62 N. H. 648) that railroads were entitled to have only the savings bank rate considered in fixing the rate at which they should be taxed. The railroad tax rate ($1.72) is not equal or proportional to the savings bank rate, because it is not the same; neither is it equal or proportional to the rate of $2.50 in Concord, or the average rate of $1.52 paid in nearly half the towns upon property other than savings bank deposits, for the simple reason that it is not the same but a different rate. Neither the constitution, nor the statute, nor the dictates of natural justice require that the railroad rate should be equal to each of the 238 or more different rates by which property is taxed throughout the state. It is impossible that it should be unless all rates are alike. The only equality possible is to the average, not of the rates, but to the average rate at which all property is taxed. If there is some property upon which the rate of taxation is changed only by legislative action and at long intervals, that fact does not prevent the taxation of such property entering into the computation of the average rate. The rates do not enter into the computation at all. The total amount levied in taxes, divided by the total property taxed, gives the average rate. Every man's taxes, if assessed by this rule, are proportional and equal. So the rate is determined by every board of assessors

in the state. There is no other way. Under it the railroad taxes, so far as the rate goes, are not only proportional, but equal to the taxes on other property.

Aside from the effect of judicial decisions, constitutional interpretation, or the construction of statutory expressions of legislative purpose, the fundamental question involved in the discussion as to the proper method of assessing railroad property is whether the method employed imposes thereon its fair share of the public burden. Whether it does or not is evidence of the legislative purpose. Because individuals on the whole pay more on their property taxed by the local assessors, the impression has arisen that railroads were favored as to the rate; but as the lower average rate is produced by the fact that on between one fourth and one fifth of their whole property individuals embracing nearly one half of the population of the state pay a lower rate, there is no injustice, but mathematical accuracy, in imposing the average rate upon railroads, who are not depositors in savings banks, and whose money, if deposited therein, would not under existing legislation be exempt from taxation by the board of equalization. P. S., c. 64, s. 12; *New England Tel. & Tel. Co.* v. *Manchester*, 72 N. H. 166; *Carter* v. *Whitcomb, ante,* 482.

It is in substance conceded in argument for the plaintiff, that the method followed is mathematically correct and just. Constitutional equality which is not also mathematically equal to a reasonable approximation is inconceivable. Taxes upon property, equal and proportional as a mathematical proposition, are constitutionally just. The substance of the entire argument in support of the plaintiff's claim is that a tax on savings bank deposits is not a property tax. If this proposition be conceded, the conclusions urged may properly follow; but until some ground is suggested for holding that when the language under discussion was used the tax on deposits was understood to be an excise and not a property tax, the argument fails. There has been no argument or claim in the entire discussion that this tax has been at any time since the decision in *Bartlett* v. *Carter*, 59 N. H. 105, or is now, generally understood to be an excise instead of a property tax. The inclusion of the tax on deposits in finding the average rate is the course directed by the legislature, and is not open to constitutional objection.

The constitutional question in this case and in *Boston etc. R. R.* v. *State*, 62 N. H. 648, was involved and decided in the two cases, *Amoskeag Mfg. Co.* v. *Manchester*, reported 70 N. H. 200, 336. In those cases the plaintiffs claimed that because certain property owners, by a low appraisal of their property, had the benefit of an exceptionally low rate, their like property must be appraised—in

effect, taxed—at the same low rate, precisely as the railroad claimed in 62 N. H. 648 that their property should be taxed at the same rate as savings bank deposits.    But it was held that the extent of the plaintiffs' right was to an appraisal of their property at the average rate of all the other property; that is, to have their tax assessed at the average rate.    If the savings bank tax is not a property tax, under the law of these cases it should not be considered; if it is, it should be.    On this question these cases throw no light.    They do not hold, but deny, that A's right is to be taxed only the same amount as B on a particular class of property. Upon the contention that on particular classes of their property individuals are taxed more than railroads on like property rests the whole claim of inequality so vigorously advanced.    That claim was held to be unsound in the Amoskeag cases, and no doubt is suggested as to the validity of the conclusions then reached.

The equality of the constitution is a practical one.    Strictly, it may be doubtful whether railroad property not located or owned in a local taxing district can be assessed for the local purposes of such district.    The difficulties of attempting to distribute the property of a railroad among all the towns in which it may be situate or owned, and to tax these separate parcels according to the varying rates,—that is, of assessing the tax as a tax of a triple character,—would be insurmountable.    The statute as it has been worked out by judicial decision and executive application, in view of the utter impossibility of any other course, places these public service corporations in a class by themselves, and does substantial justice by requiring them to pay the same rate of tax as is paid by all other property not in that class.    Whether the legislature could properly devise some other method need not be considered. The method is just and equitable as between railroad and all other property, and does not violate any rule requiring proportional assessments.    Even if the court agreed that some other method would be more economically sound, more productive of revenue, or technically more clearly within constitutional limits, the court has no power to improve the statute by adding to or taking therefrom.    So long as the legislature directs, as they plainly have, the inclusion of the savings bank taxes in finding the average rate, the court has no power to order their exclusion.

The question so far as it relates to the taxation of insurance capital has not been considered, because the result in this case would not be affected by any conclusion that might be reached. Upon the facts alleged, the writ of *certiorari* could not be maintained if the claim as to this tax should be held well founded. The court are no more at liberty to advise the board of equalization at the plaintiff's request, than at their own.    *Bingham* v. *Jewett*,

66 N. H. 382, 384; *In re School-Law Manual*, 63 N. H. 574, 576; *Opinion of the Justices*, 62 N. H. 704, 706. It may not, however, be improper to remark that many considerations which require the inclusion of the savings bank tax do not apply to this tax. If it should in the future become material and there should be controversy as to it, the question can easily be presented.

*Demurrer sustained.*

WALKER and YOUNG, JJ., concurred.

PEASLEE, J., *dissenting*. The opinion of the court decides that a new method of railroad taxation was adopted either in 1881 or 1891. It rejects the view that the act of 1881 and the revision of 1891 merely amended the law so far as necessary to bring it within the constitutional requirements laid down in *Boston etc. R. R.* v. *State*, 60 N. H. 87. The conclusion is reached by giving too great weight to the acts of the board of equalization and the attorney-general, and too little weight to the history of the law and the action of the court in relation to it.

The first statute on the subject was passed in 1842, as an amendment to the report of the commissioners who revised the statutes. Comm'rs' Rep. R. S., *c.* 39; R. S., *c.* 39, *ss.* 4–6. It provided for a tax of one per cent upon the value of that part of the capital stock expended within this state, to be determined by the certificate of the justices of the superior court. *Ib., s.* 4. No tax was ever assessed under this law. The Revised Statutes became effective March 1, 1843 (R. S., *c.* 230, *s.* 1), the court did not meet thereafter until July (R. S., *c.* 171, *s.* 12), and before that time the statute of 1842 had been repealed by the act of July 1, 1843, which provides that the tax shall be assessed "in proportion, as near as may be, to the taxation of other property on the first day of April, . . . . in the several towns in which said railroads are situate." Laws 1843, *c.* 34, *s.* 4. Under this statute the court assessed a tax based upon the municipal tax rate from the beginning. In the language of their certificates filed with the state treasurer, they "assessed a tax on said corporation in proportion as near as might be to the taxation of other property the present year in the towns through which the road passes." Certificate of Justices *Gilchrist, Woods*, and *Eastman*, dated August 29, 1850.

The idea that the tax was at the fixed rate of one per cent until 1867 has apparently arisen from the error made by the compilers who edited the statutes in 1853. In this edition the acts of 1842 and 1843 are both printed, as though the tax were assessed

at one per cent and also at the local rate. C. S., *c.* 41, *s.* 4. The apparent impossibility of complying with both these requirements (except by some process of assessorial legerdemain) would of itself throw great doubt upon the editors' views. The action of the court is ample evidence that the act of 1842 was repealed in 1843, and further confirmation is found in the commissioners' report in 1867. "The capital of every railroad expended in this state shall be taxed as near as may be in proportion to the taxation of other property in April of each year, in the several towns in which such railroad is located." Comm'rs' Rep. G. S., *c.* 58, *s.* 1. In adopting this section, the commissioners understood that they were using substituted words to express the meaning of the existing law. They did not intend to change the sense. *Ib.*, marginal notes; Introductory Rep., *p.* iv. The section was adopted without change (G. S., *c.* 57, *s.* 1), and the court continued to assess the tax as it had from the beginning. The commissioners' report on this topic is entitled to more than ordinary consideration, from the fact that each of the commissioners (Samuel D. Bell, Asa Fowler, and George Y. Sawyer) had been a member of the court and participated in assessing the railroad tax.

Prior to 1864, deposits in savings banks (less small exemptions) were taxed locally as money at interest. Laws 1833, *c.* 108. So long as this was the law, the tax upon savings bank deposits was included in the calculations for obtaining the local rate. In 1864, the system of savings bank taxation was changed, and a tax of three fourths of one per cent on the deposits and accumulations due to depositors was collected by the state. That representing the deposits of residents was paid to the cities and towns where they resided, and that on the deposits of non-residents was retained by the state. Laws 1864, *c.* 4028, *s.* 1. This change brought before the court, in 1865, the question now being litigated: Should the savings bank tax, collected by the state, but for the direct benefit of the municipality, be considered in determining the average rate of taxation upon other property? The act of determining this question was judicial.

"In one class of tax cases our jurisdiction of the questions of liability and amount has been original. From 1843 to 1878 the statute required the railroad tax to be assessed by the justices of this court. . . . The obligatory force of this law has not been an open question since the judicial character of the assessment has been fully admitted. . . . Whatever doubt or opinion may have been entertained by any or all of the judges before the judicial nature of the work was seen and acknowledged, the record shows that for at least eighteen years—the latter half of the period during which the railroad tax was assessed by us and our pre-

decessors—the assessors understood they were acting in the official capacity of justices of this court." *Doe*, C. J., in *Boody* v. *Watson*, 64 N. H. 162, 175, 176.

In the performance of the recognized judicial duty, it was incumbent upon the court in 1865 to determine the *status* of the new tax as related to the railroad tax. The issue was not merely a theoretical one. Its decision involved substantial sums. In the city of Nashua alone, and as to one railroad only (the Nashua & Lowell), it would have made a difference of over $200 in the annual tax. The circumstances were such as to call this matter into prominence. It was near the close of the war, when taxes were on the increase. To follow out the above example: The rate in Nashua went from $1.40 in 1864, to $2.25 in 1865. Twelve cents of this was caused by the withdrawal of savings bank deposits from the local assessment.

The decision of the court was that the tax should be assessed at the local rate, as it had been, and the savings bank tax was left out of the reckoning. Each year thereafter, until 1879, the question was before the court for decision, and the construction put upon the statute was always the same. This alone may well be deemed to settle and fix the meaning of the statute. *Fitchburg R. R.* v. *Prescott*, 47 N. H. 62, 67. In that case it was said that it was the settled practice of the justices of the court in assessing the railroad tax to include fuel on hand for immediate use as part of the taxed estate ; and it was held that "upon the point whether these materials are properly so taxed, the long and settled practice of the court might well be considered as conclusive." This language is quoted with approval by Chief Justice *Doe* in *Boody* v. *Watson*, 64 N. H. 162, 176.

Early in the seventies tax agitation increased. Judge Sawyer's report in 1876, as chairman of the first commission, does not refer to the railroad tax ; but the report of the second commission, in 1878, gives the full record of the extended hearings upon this subject, and a copy of the legislation proposed by the commission. A perusal of the arguments advanced by counsel for the various railroads will disclose that none of them claimed that the savings bank tax was or ought to be included in calculating the rate. There was criticism of the theory adopted for valuing railroad property, and much complaint of the inequality of taxation caused by using the local rate instead of the average rate throughout the state ; but no suggestion was made that there was either legal or equitable claim under existing statutes to a reduction of the railroad tax because of the favor shown savings banks. App. Rep. Tax Comm'rs, 1878, *pp.* 43, *et seq.* In the brief filed by counsel for the roads, the disparity between the savings bank tax and the

railroad tax is pointed out and urged as a reason against further increasing the railroad tax. It is not there claimed that the roads are entitled to share in the existing discrimination against tax-payers in general. *Ib.* 68, 69. The commission proposed an act levying the tax on the road, rolling stock, and equipments at the average rate of taxation in all the cities and towns in the state (*Ib.* 173), and an act establishing the state board of equalization (*Ib.* 193).

The commissioners to revise the statutes reported the existing law without change. Comm'rs' Rep. G. L., *c.* 58. The legislature adopted a compromise measure making the basis for valuation the road, rolling stock, and equipment, but retaining the provision as to the local rate (Laws 1878, *c.* 70; G. L., *c.* 62, *s.* 1), and established the board of equalization. Laws 1878, *c.* 73; G. L., *c.* 61. It would seem that this second re-enactment of the statute as to rate, after thirty-five years of uniform construction by the court, and in view of the arguments reported by the tax commissioners to the legislature, must have given a clear and settled meaning to the language of the act. The legislators must have understood that the rate named in the statute was the rate in cities and towns.

In 1879, the board of equalization assessed the tax as the court had theretofore assessed it, excluding the savings bank tax. The Boston, Concord & Montreal Railroad ran through towns having a high tax rate; and upon an appeal by that road it was held that as the levy was in part, at least, a state tax, it must to that extent be assessed at the average rate throughout the state, because the state was the taxing district. The question whether it was wholly a state tax was left undecided. *Boston etc. R. R.* v. *State,* 60 N. H. 87. The referees by whom the facts were found thereafter reported the average local rate throughout the state, and the court ordered the tax assessed at that rate.

After this decision, the board of equalization voted that the railroad tax be considered a state tax and that it be assessed at a uniform rate. To determine the average rate, they added the total of the local inventories to the taxable savings banks deposits, and the total local tax to the savings bank tax; and, dividing the second result by the first, found an average rate of $1.44 +. They then voted that the railroad rate be reduced from $1.44 to $1.25, because other property was undervalued, and assessed the tax at the last mentioned rate. From the tax so assessed the Boston, Concord & Montreal Railroad again appealed, and the case was sent to three referees. Judge Jeremiah Smith was chairman of this board. The case was fully argued both before the referees

and the court. 148 Briefs and Cases 321, *et seq.* It was before the court on a preliminary ruling of the referees in June, 1882, and the next fall they made their final report. This report sets out in detail the method adopted by the board of equalization to include the savings bank tax. It also contains other computations, including that tax by a different method of calculation. After placing all phases of the matter fully before the court, the referees decided that the savings bank tax was to be wholly excluded, and found the amount of the railroad tax upon that basis.

In August, 1883, the court delivered the opinion affirming the judgment of the referees. "By the act of 1878 (G. L., *c.* 62, *s.* 1) and the act of 1881 (*c.* 53), railroads are taxed 'as near as may be in proportion to the taxation of other property' in towns and cities. The savings bank tax (G. L., *c.* 65, *s.* 8) is an anomaly, resting on peculiar grounds of public policy, and is universally understood to have acquired the position of an exception to the constitutional rule of equality. It is so regarded in the assessment of state, county, and town taxes upon unincorporated persons, and in their tax appeals; and the plaintiffs' charter is not a statutory or constitutional ground of exemption." *Boston etc. R. R.* v. *State*, 62 N. H. 648, 649. This language seems reasonably plain. The savings bank tax is an exception; it cannot be classified; and as it is not taken into account in assessing the taxes of individuals, so it is to be disregarded in assessing taxes of corporations.

It is urged that because this particular method of taking advantage of the savings bank rate was not argued to the supreme court, therefore the question was not there decided. This argument fails to take into account the nature of the proceeding and the duty of the court in the premises. The appeal is taken from the decision of the board of equalization to the supreme court at its law term; and upon the appeal the court is required to make such order as justice requires. G. L., *c.* 61, *s.* 9. By this procedure all questions of assessment are transferred to the court for final decision. *Boody* v. *Watson*, 64 N. H. 162, 175. The positions taken by Judge Ladd on behalf of the road were: (1) That the tax was wholly unconstitutional; (2) that it could not be assessed at a higher rate than the savings bank tax of one per cent. Both of these positions were denied by the court. Had it then decided the case? By no means. It had merely decided (as to two propositions) what the tax should not be. The problem of what the tax should be was still to be solved. The scope of inquiry had been narrowed by the elimination of these two propositions, but the question what the assessment should be remained. The judges had before them the referees' report, calling to their

attention the somewhat crude method by which the board of equalization included the savings bank tax. It also presented a more scientific calculation for the inclusion of that tax; and it closed with the decision of the referees that the law was that the savings bank tax should be excluded. With this report to act upon, and in discharge of the duty to dispose of all questions presented as justice required, the court made use of the language before quoted. In so doing they intended to decide, as Judge *Isaac W. Smith* entered upon his files, that the tax was " to be assessed as if there were no savings banks "; or, to put it as Judge *Clark* made the entry in his docket, it was " agreed that no deduction of tax should be made on account of savings bank tax being one per cent and other property one and a half per cent." The argument that because the omission of the savings bank tax from the calculation would have made a difference of but a few hundred dollars in the tax assessed, therefore the court paid no attention to that matter, is hardly worthy of serious consideration. The question involved was a legal one. It was not a commercial transaction.

It is further urged in disparagement of this case as an authority, that the final order for abatement, made at the June law term, 1884, is not in harmony with this view of the decision. Before taking the appeal the road paid $17,000 on the tax assessed against it, and the referees were of opinion that the tax should be $21,255.68, leaving a balance due of $4,255.68. The claim is that the court thereafter allowed an additional abatement of $2,331.10, so that the balance finally paid was but $1,924.58; and from this it is argued that whatever the decision may mean, it cannot be what the plaintiff here contends. When the facts are fully known, this position is seen to be untenable. The idea that only $1,924.58 was paid comes from a statement in the printed report of the state treasurer for the year 1888, wherein this sum is named as the balance received from the Boston, Concord & Montreal on account of the tax for 1880. In fact, it was the balance of the $4,255.68 due upon the tax for 1880, after deducting therefrom an abatement of $2,331.10 which the road had obtained on the tax for 1881. *Boston etc. R. R.* v. *State*, 64 N. H. 490. The order allowing the abatement of $2,331.10 was made in the appeal from the tax for 1881 in 1888, four years after the case involving the 1880 tax went off the docket. When the facts are rightly understood, it appears that the order made in 1884, and complied with in 1888, constitutes an additional affirmation of the rule by the court. Here, again, added weight is given to the transactions by the fact that the chairman of the referees and the counsel for the road had both been members of the court when it assessed the railroad tax.

With the disposition of that case, litigation on this subject ceased, and the court had no further occasion to construe the statute until the question was raised in this proceeding. The record of forty years constant dealing with the matter of fixing the rate shows that one course was consistently pursued. From the assessment of the first tax in 1843, it was levied in proportion to the local rate. In 1865, it was decided by the judges to continue to assess at the local rate, and leave out the newly created savings bank tax. This decision was yearly reaffirmed when the assessments were made, until 1879. In that year the board of equalization followed the same rule, but abandoned it the next year. In 1882, Judge Jeremiah Smith held that the rule followed by the court was the correct one, rejecting the innovation sought to be introduced by the board of equalization. In 1883, the opinion heretofore quoted (62 N. H. 648) again asserted the position that the savings bank tax was not to be considered, and the order in the case made the next year reaffirms the decision. No other rule was ever countenanced by the court.

The legislature of 1881 amended the law to conform to the decision of *Boston etc. R. R.* v. *State*, 60 N. H. 87, substituting " all the cities and towns of the state " for " the several towns and cities in which such railroad is located." Laws 1881, *c.* 53; *Boston etc. R. R.* v. *State*, 62 N. H. 648; *State* v. *Jackson*, 69 N. H. 511, 523. The commissioners to revise the statutes in 1891 reported the act with changes which were not intended to alter its meaning (Comm'rs' Rep. P. S., *c.* 63, *s.* 1), and the legislature adopted the act as reported by the commissioners. P. S., *c.* 64, *s.* 1. Applying the usual rule, it must be held that the construction of the statute has thus become settled, so that it cannot be changed except by legislative action. *Tomson* v. *Ward*, 1 N. H. 9; *Jewell* v. *Holderness*, 41 N. H. 161; *Frink* v. *Pond*, 46 N. H. 125; *Parsons* v. *Durham*, 70 N. H. 44; *Burgess* v. *Burgess*, 71 N. H. 293. ·

It is urged that there has been "continued uninterrupted acquiescence and recognition of the method of the board of equalization by the legislature." This assertion is not borne out by the record history of the board and its relations to the legislative department. The act creating the board contained no provision for its making any report of its doings to the legislature. An abstract of its equalization of local valuations throughout the state was to be compiled by the secretary of state as a basis for apportioning the state tax. The secretary of state was to lay this before the legislature at the opening of the session, when the state tax was to be apportioned. Laws 1878, *c.* 73, *s.* 8; G. L., *c.* 61, *s.* 8. The records of the board's proceedings were to be filed with the secretary of state. Laws 1878, *c.* 73, *s.* 2; G. L.,

c. 61, s. 2.  A certificate of "their determination" as to the rail-road tax was to be filed with the state treasurer.  Laws 1878, c. 70, s. 4 ; G. L., c. 62, s. 4.  There were no other provisions for re-porting the acts of the board.  The provision requiring an annual "report of their doings" to be filed with the secretary of state was added by the commissioners who revised the statutes in 1891.  Comm'rs' Rep. P. S., c. 62, s. 7 ; P. S., c. 63, s. 7.  There are, then, three places where information concerning the acts of the board from 1879 to 1891 may be sought: the record filed with the secretary of state, the reports to the legislature, and the certificates filed with the state treasurer.

The records of the board for 1879 do not show what the rate was or how it was determined.  After the decision in *Boston etc. R. R.* v. *State*, 60 N. H. 87, the board met on September 7, 1880, and considered the recent decision of the supreme court in the appeal cases, and counsel were heard in reference to the intent and meaning of the decision.  The next day it was voted that the tax upon railroads be regarded as a state tax and be assessed at a uni-form rate.  September 29, they adopted a resolution reciting that the average rate of taxation upon the taxable property of the state was about $1.44, and that there was such undervaluation that the railroad tax ought to be assessed at $1.25.  Below the record of this meeting is an unsigned statement, evidently written by the secretary of the board, as follows:

### VALUATION AND TAXATION, 1880.

| | | |
|---|---|---|
| Amount of inventories $168,995,309 | Taxes on same | $2,563,144.31 |
| Savings bank deposits    28,293,929 | "    "    " | 282,939.29 |

| | | |
|---|---|---|
| Amount taxed         $197,289,238 | Amt. of taxes | $2,846,083.60 |
| Average rate 1.442 on a $100. | | |

This is the assessment from which the appeal was taken which is reported 62 N. H. 648.

In 1881, below the record of the meeting held September 21, is a similar statement of valuation and taxation, giving a rate of $1.46.  September 27, it was voted to fix the railroad rate at $1.25, "so that the rate be fixed proportionally as much below the average rate upon other property as other property has been undervalued."

In 1882, the board reheard many appeals from the tax of 1881, which were sent to them by the court under the rule adopted at the December, 1881, law term.  There is no record of how the abatements were allowed, but the files of the court in the several counties seem to show that it was because other property was

undervalued. The rate question was not considered. There is a similar statement as to valuation and taxation this year, giving a rate of $1.41. The railroads were taxed at this rate, and their valuation was reduced eighteen per cent because other property was undervalued. By this method the railroads were given the benefit of the lower rate on savings banks twice—once by the reduction of rate and again by a reduction of values. The same thing is probably true of the preceding year, when the rate was reduced twice. From this time the method of reducing valuation, instead of a second reduction of the rate, was followed.

In 1883, a similar record was made. The rate was $1.49, and seventeen per cent was taken from the valuation.

All these assessments were made before the court decided the 1880 appeal. That decision was announced late in August 1883, and the assessment for that year was made July 13—a month or two earlier than in former years. The first secretary of the board died before their sessions in 1884, and there is no further record of how the rate was made up, nor does it appear (as it did appear in the 1879 appeal case) that any consideration was given to the decision of the court. From 1884 to 1890, the record merely shows a vote to assess at the "average rate" of so much, with certain percentages deducted from the valuation.

The legislature did not understand that under the law the board was required to report to it upon the railroad tax. In 1881, the house adopted a resolution requesting the board to report in what way and manner they made the railroad tax, upon what basis they valued the railroad property, how they determined the rate of taxation, and whether they made the assessment in accordance with the statute. The board replied: " We regarded the railroad tax as a state tax, and held that as such it should be assessed as near as practicable upon a uniform valuation with the other property of the state and at a uniform rate. How we endeavored to effect these objects will more fully appear from our answer to the other branches of your inquiry. . . . The rate of taxation was determined by the average rate of taxation of the other property in the state, modified by a proportional value thereof. To this end we received evidence to show that the property of the state was not assessed at its full value ; and having ascertained, so far as the evidence showed, the extent of such undervaluation, we deducted from the average rate of taxation a per cent equal to the per cent of undervaluation, and thus made the valuation and rate of taxation of railroads as near as practicable uniform with that of other property in the state. To the question whether this assessment is in accordance with the statute, we have to say : The statute (chap. 62, sec. 1, Gen. Laws) provides that the tax on

railroads shall be 'as near as may be in proportion to the taxation
of other property . . . in the towns and cities in which such
railroad is located.' This implies that the railroad tax is a mu-
nicipal tax; but the supreme court, in the case of the Boston,
Concord & Montreal Railroad's appeal from our assessment of
1879, practically decided that this tax is a state tax. And in that
opinion the court say that 'if the railroad tax is a state tax, this
statutory provision is in conflict with the constitution, since a
state tax must be proportional throughout the state.' Following
what seemed to us the plain interpretation of this opinion, we
assessed the railroad tax as a state tax, and disregarded the statu-
tory provision referred to. A copy of the valuation and assess-
ment of the several railroads is hereto annexed." Journal of
Senate and House, 1881, *p.* 395. There was no statement of the
rate and no further information given as to how it was arrived at.

September 6, 1887, Governor Sawyer transmitted to the senate
and house the report of the board for that year. In the house,
this was ordered to be referred to a special committee of one from
each county, and no further notice was taken of it. In 1889, the
report of the board for 1888 was transmitted with other depart-
ment reports. All others were referred, but nothing was done
with this. Assuming that these were the printed reports, neither
of them contained any reference to the railroad tax; and aside
from these, the journals do not disclose any reports from the board
from 1881 to 1891. These two reports (for 1887 and 1888) are
included with the bound volumes of department reports for 1887
and 1889 respectively. No others were so included up to 1891.

It might be urged that the secretary of state presumably laid
before the legislature the printed summary provided for by the
statute, that this was probably the statement entitled "Valuation
and Taxation in New Hampshire," and that in this way the legis-
lators were informed. Assuming this to be true, what does it
show for the period under consideration? The printed report for
1881 contains a summary of the local assessments and taxes, and
at the foot a computation adding these to the savings bank de-
posits and tax, and a statement that the average rate is $1.46.
This includes the savings bank figures, although that fact is not
stated. Immediately following this, as a part of the same state-
ment, is the following: "Add to the amount of taxes above given
the railroad and telegraph taxes (estimated as assessed last year)
$176,192, and we have the whole amount of taxes assessed upon
the persons and property of the state, to wit, $3,111,007, being a
little less than $9 for each inhabitant." There is no other refer-
ence to the railroad tax.

In 1882, there is a similar recapitulation giving an average rate

"including savings banks," followed by the summary for the preceding year. The reports for 1883, 1884, and 1885 are in similar form.

In 1886, there is the first statement of the railroad tax. It appears as a table giving taxable valuation of and the tax assessed against each road. In the summary of valuations, similar to those in former years, the rate is this year omitted for the first time. A mathematical computation shows that in the cities and towns it was $1.52, that including savings banks it was $1.413, and that the railroads were assessed at $1.42.

In 1887, the table of railroad taxes disappears, and the statement of the rate reappears. There was a similar report in 1888, with the additional element of capital in insurance companies and tax thereon.

In 1889 and 1890, the rate is given, followed by the usual statement of the rate, etc., for the previous year, and there is a table of valuation and taxation of railroads, but no accompanying statement of rate. In none of these years is railroad taxation or average rate mentioned in the preliminary report of the board. In the volumes of annual departmental reports, printed and bound by the state for preservation in its archives and for distribution to the towns and libraries in the state, this report was not included. G. L., *c.* 5, *s.* 6. The people were never officially informed of the acts of the board of equalization until the passage of the act of 1891, calling for a report. P. S., *c.* 63, *s.* 7. Such information on this subject as went to the legislature was an addendum to tables returned as a basis for assessing the state tax, to which this information was not germane. It appeared as information of general interest, with nothing to show its relation to the railroad tax. When requested to state how they determined the rate, in 1881, the facts were not given by the board, and they never stated in plain terms how the railroad rate was made up. Their certificates filed with the state treasurer follow in substance the form adopted by the court before 1878, and give no information on this subject.

It is immaterial why these reports were made as they were. The issue here is the publicity given to the details of the acts of the board. It is evident that what they had done could have been discovered by a search of the records in the secretary of state's office, coupled with mathematical computations based upon those records and the printed reports. But the claim here is that these acts were "notorious." The question is not: Could it have been proved that the acts were done? The issue is: Did the people know the facts? It rests upon the proponents of the doctrine of repeal by practical construction to establish their case.

The available evidence here seems to disprove their proposition. Certainly, it does not prove the things necessary to establish that the people of the state, by their representatives in the legislature of 1891, knowingly and intelligently abandoned the right to a considerable portion of the tax upon public service corporations.

If further proof is sought as to how much or how little was known in the late eighties of this course of procedure, it may be found in the interesting history of the Boston, Concord & Montreal Railroad's appeal from the tax for 1881. That case was made an exception to the general practice in that year and was heard by the court, instead of being sent for a retrial before the board of equalization. The reason appears to have been that in this case there was a special question (the value of the road) not common to the other cases. At the trial early in 1888, counsel for the road claimed that the rate found by the board of equalization for 1881 was $1.46. February 24, 1888, the secretary of the board, in response to an inquiry from counsel for the state, wrote him that the "board rate" for 1881 was $1.40. This was accepted by counsel on both sides and by the court as final, and the decision in the case rests upon this letter. The rate was in fact $1.46. That fact could have been ascertained either by inspecting the records of the board on file with the secretary of state or from the printed statements of "Valuation and Taxation," often referred to as the reports of the board. The evidence was not obtained from either of these sources. The fact that the rate reported varied largely from that printed in the statement of valuation and taxation, and from the record at the state house, passed unnoticed by either court or counsel. It is evident that the notoriety of this procedure did not extend to the legal profession at that time. Knowledge of how the state board of equalization was assessing a tax, not possessed by eminent counsel or by judges of the supreme court, is not to be imputed to the constantly changing membership of the legislature.

There is another source from which it is quite likely the legislators obtained knowledge of this decision of 1883. Morrison's Digest, issued in the bound volume in 1891, was available in the advance sheets in 1890. Under the title "Taxation," subhead "Banks, Railroads, Telegraph Companies," he states the law of this case (p. 735): "In the assessment of a railroad 'as near as may be in proportion to the taxation of other property' in towns, the rate at which savings banks are taxed by the state is not considered. B., C. & M. Railroad v. State, 62–648." Whether this was or was not known to the legislators, it is convincing proof that knowledge of the overruling power of the acts of the board of equalization had not become universal in 1891.

The evidence is more persuasive that the legislators did not, than that they did, know how the board was assessing this tax. In one year (1881) we have the direct testimony of the house that it was ignorant of the rate and wished to be informed. It knew no more (so far as this issue is concerned) after the board made answer than it did before. If on the one hand it is to be urged that, with all this evidence of lack of knowledge, it is still presumed that the legislators knew what was being done by this board of lay judges, and that it approved and adopted their acts, what is to be said about their knowledge of the longer period covered by the contrary practice of the supreme court, of the earliest practice of this board, and of the reversal of its later action by the court? It is not to be presumed that the legislature understands that six years of disregard of a decision by the board of equalization overrules the action of the court of last resort.

It is said that, conceding the soundness of all that is urged as to the history of the statute, yet the legislature of 1891 must have intended to include the savings bank tax in the computation of the rate for the railroad tax because the court in 1879 held the former to be a property tax. This argument only takes into account a part of the evidence. If the legislature in 1891 knew that the court said in 1879 that the savings bank tax was a property tax, they also knew that in 1883 the court said " the savings bank tax is an anomaly, and is universally understood to have acquired the position of an exception to the constitutional rule of equality. It is so regarded in the assessment of state, county, and town taxes upon unincorporated persons, and in their tax appeals; and the plaintiffs' charter is not a statutory or constitutional ground of exemption." 62 N. H. 649.

But aside from the question of precedent, the case is against the defendants upon principle, because of the nature of the savings bank tax. The tax is computed at three fourths of one per cent upon the amount of general and one per cent upon the special deposits on which the corporation pays interest, including dividends declared but not paid, with certain exemptions. P. S., c. 65, s. 5; Laws 1895, c. 108, s. 1; Laws 1907, c. 102. It is not a tax levied upon a valuation put upon the property of the bank. It is not computed at the varying rate which is determined from year to year by the extent of the public needs. Whether the bank has much or little surplus, whether its assets have been carried on the books at a high or low figure, the amount of the assessment is not varied; and whether the needs of government be great or small, the rate is always the same. Such a tax is not a tax upon property, but rather a privilege tax, or an excise upon the fran-

chise which the bank enjoys. This is the almost universal rule. *Jones* v. *Bank*, 66 Me. 242; *State* v. *Bank*, 71 Vt. 234; *Commonwealth* v. *Bank*, 5 Allen, 428; *S. C.*, *sub nom. Provident Institution* v. *Massachusetts*, 6 Wall. 611; *Suffolk Savings Bank*, *Pet'r*, 151 Mass. 103; *Coite* v. *Society*, 32 Conn. 173; *S. C.*, *sub nom. Society for Savings* v. *Coite*, 6 Wall. 594; *Monroe Savings Bank* v. *Rochester*, 37 N. Y. 365; *State Assessors* v. *Railroad*, 48 N. J. Law 146; *Trenton Savings Fund* v. *Richards*, 52 N. J. Law 156; *United States etc. Co.* v. *State*, 79 Md. 63; *Southern Gum Co.* v. *Laylin*, 66 Ohio St. 578; *Pingree* v. *Auditor-General*, 120 Mich. 95; *State* v. *Anderson*, 90 Wis. 550; *Plummer* v. *Coler*, 178 U. S. 115; Cool. Tax. (3d ed.) 412, 413. See, also, the authorities collected in the note, 60 L. R. A. 333.

An *ad valorem* tax is a tax " upon property by a valuation, and effect can only be given to it by means of assessors, who value the property and apportion the tax by their estimate." Specific taxes are " those which impose a specific sum by the head or number, or by some standard of weight or measurement, and which require no assessment beyond a listing and classification of the subjects to be taxed. License taxes and other taxes on business or occupation, stamp taxes, taxes on franchises and privileges, are usually specific. . . . As regards all such taxes, the law by which they are laid is of itself a complete apportionment. Ministerial officers have nothing to do but to list the subjects of taxation; classify them where that is necessary; ascertain the number, weight, measurement, etc., . . . and collect the sum which the law has definitely fixed." Cool. Tax. (3d ed.) 412, 413.

" The decisive reason why it cannot be supported as a tax on property, in the sense in which that phrase is used in the constitution in the article cited, is that it is not ' proportional '; that is, it is not laid according to any rule of proportion whatever, but is imposed only on the corporations designated in the act, without any reference to the amount required to be raised by taxation for public purposes, or to the actual property held by such corporation subject to taxation, or to the whole amount of property in the commonwealth liable to be assessed for the public service." *Commonwealth* v. *Company*, 12 Allen 298, 300.

The amount of the tax " is not fixed or determined by a valuation of the property of the bank. The average of deposits during a certain period includes only the amount credited to depositors. It does not embrace a valuation of the investments made by the bank, or the market value of its property. The tax is assessed wholly irrespective of investments, and without any regard to the profit or loss made or incurred by the corporation on

the property in its possession or on the business which it has carried on. The average of deposits during the period of time denoted in the statute may not be equivalent to the whole property owned by the bank, exclusive of money invested in the securities of the government. The amount of the tax in no way depends on the aggregate of the investments of the bank. It must be the same whether the investments have been profitable or otherwise. No valuation of property is necessary to the assessment of the tax, and none is in fact made. How, then, in any just sense, can the assessment be deemed to be a tax on property?" *Commonwealth* v. *Inst. for Savings*, 12 Allen 312, 314.

Much of the reasoning contained in these authorities appears to to have been approved in this state. "The idea of proportional and reasonable or just and equal taxation is founded on the declaration in the bill of rights, that every member of the community is bound to contribute his share in the expense necessary to the protection of his property. This proportion is wholly destroyed by fixing a tax upon value on one kind of property, and a tax on gross receipts upon another. While the amount to be raised on other kinds of property depends upon the amount required for public objects, and the rate of taxation depends upon the amount of property within the taxing district and the public necessities, under the statute in question the rate is always the same. There can be no proportion or equality between that which is fixed and that which is uncertain and fluctuating." *State* v. *Express Co.*, 60 N. H. 219, 245. The last sentence states the present case in a nutshell. There can be no proportion between the fluctuating railroad tax and the fixed savings bank tax.

The suggestion that the savings bank tax is laid upon the property of the depositors is the only reason which has been advanced for the holding which is peculiar in this state. In no case is the matter reasoned out. No attempt has been made to answer the convincing logic which has prevailed in substantially all other jurisdictions. If the conclusions here reached resulted from irresistible logic, they should be followed, even against the unanimous judgment of all other courts. If they did not so result, they should be abandoned.

It was first held that the assessment upon savings banks was a property tax. *Bartlett* v. *Carter*, 59 N. H. 105. The next step in the progress of the argument is the decision that all property taxes must be proportional. *Boston etc. R. R.* v. *State*, 60 N. H. 87, 96. Immediately after this follows the decision that our constitution provides "no warrant for the imposition of any other tax than one assessed upon a proportional and equal valuation of all the different kinds of property on which it is to be levied." *State*

v. *Express Co.*, 60 N. H. 219, 246. And then the question of the constitutionality of the savings bank tax was presented for decision. The court said : " The savings bank tax is an anomaly, resting on peculiar grounds of public policy, and is universally understood to have acquired the position of an exception to the constitutional rule of equality." *Boston etc. R. R.* v. *State*, 62 N. H. 648 ; *Somersworth Savings Bank* v. *Somersworth*, 68 N. H. 402.

The tax was sustained, as an anomaly, because of the universal understanding that such a tax was an exception to the constitutional rule of equality. It was anomalous because its name and kind had theretofore been excluded by the court from the New Hampshire constitutional scheme for taxation. There was no power to lay a franchise tax in this state. But by the universal understanding, such a tax was given a place in a constitutional scheme for taxation. It was an exception to the constitutional rule of proportional equality, as all specific taxes are. So while the court in this state generally denied the validity of these taxes that would be valid elsewhere, in this instance the tax was held to be valid. The universal understanding could not be ignored ; yet the decision could not be reconciled with the previous utterances of the court. The court having declined to follow its argument to its legitimate conclusion, the logic of the situation called for a modification of the earlier cases. Whether the decision was intended to effect such a result, cannot be ascertained. The matter was disposed of with the brief declaration that the law was as stated. There is in all this at least a suggestion that the earlier decisions against the constitutionality of any tax not assessed by a proportion common to all other taxes may have been erroneous ; and this doubt appears to have recent sanction. *Thompson* v. *Kidder*, *ante*, 89, 90.

But it is not necessary to now determine whether an excise on a franchise could or could not have been levied in 1880. By the amendment to the constitution adopted in 1903, taxes upon franchises are expressly provided for, and must now be valid if not repugnant to other constitutional limitations. *Thompson* v. *Kidder*, *supra*, 96. If before 1903 franchise taxes were anomalies which could not be classified under our constitution, they are so no longer.

Not being a property tax, this levy upon savings banks is not included in the class of taxes upon property. A tax upon a fixed basis of value, and at a fixed rate, has no logical relation to one upon the true value of property, assessed at a fluctuating rate adjusted to the varying public needs. " There can be no proportion or equality between that which is fixed and that which is

uncertain and fluctuating." *State* v. *Express Co., supra;* *Oliver* v. *Washington Mills,* 11 Allen 268, 277.

It is said that this reasoning is fallacious because the figures can be combined and the rule of three can be applied to the result. Of course, any figures relating to any subject, or to an indefinite number of subjects, can be thus combined and an arithmetically correct result obtained. But much more than a question of arithmetic is here involved. It is the constitutional question of whether, in assessing taxes upon property (as distinguished from excises), the rule of proportional equality must be followed. The soundness of that rule has never before been doubted by the courts of this state. The same line of reasoning now adopted by the court was urged by counsel in *Amoskeag Mfg. Co.* v. *Manchester,* 70 N. H. 336, on the subject of including poll taxes in the determination of distribution of the common burden. It was there conceded that the defendants' mathematics were faultless; but the fact that there was error " in taking as the common burden to be proportioned the whole tax instead of the property tax " was then seen to be fatal to the proposed process. It is equally so here.

By the process here adopted by the majority of the court, the railroad tax is in part based upon an equal distribution of the public needs from year to year and in part upon an arbitrary rate. The result cannot be a tax based wholly upon an equal distribution of the annual burden. Unless it is true that A's property tax can be levied at the rate required for public uses and B's tax upon his property at a fixed rate, the process adopted is faulty and the conclusion reached is wrong. In *Boston etc. R. R.* v. *State,* 62 N. H. 648 (where the question of the nature of the savings bank tax was involved), and again in *Somersworth Bank* v. *Somersworth,* 68 N. H. 402 (where the constitutionality of that tax was directly in issue), it was said that the savings bank tax is " an exception to the constitutional rule of equality." Any other tax apportioned according to this tax must in turn be contrary to that constitutional requirement.

The railroad tax is a property tax, and must be laid in accordance with the constitutional rule of equality. If the statute calls for a levy in violation of this rule, it is unconstitutional and void. *Boston etc. R. R.* v. *State,* 60 N. H. 87. The presumption is that the legislature intended to keep within constitutional limits. *State* v. *Jackson,* 69 N. H. 511. The mere fact that the statute can be construed to infringe the constitutional limitation is not enough to warrant such an interpretation of the legislative intent. The rule is imperative that such an intention is not to be implied. It must be clearly manifested. *Leavitt* v. *Lovering,* 64 N. H. 607.

A legislative intent to thus violate the rule of equality is not

shown in this case.  The act of 1881 was passed because the court had just said that the statute as it then existed was an offence against that rule.  The evident and only purpose of the legislature was to correct that error.  It is as certain that it did not intend to include what the constitution excluded, as that it intended to correct the former exclusion of that which the constitution included.  In a peculiar degree, the thought that the statute be kept within constitutional limits must have been in the minds of those legislators.  "And when the intention of the legislature is plain, it is the duty of the court so to construe the act as to carry out the intention if the language used will fairly admit of such construction."  *State* v. *Jackson*, 69 N. H. 511, 526.

The case as to the insurance tax is still clearer.  A stock fire insurance company pays "a tax of one per cent upon the amount of its paid-up capital on the first day of April."  P. S., c. 65, s. 9. It is common knowledge that while the stock in some of these companies has been and is of large value, that in others has been worth nothing.  But the same tax—one per cent upon the par value of the stock—is uniformly levied.  It seems superfluous to extend the argument upon the proposition that this is not a property tax.  The soundness of the conclusion appears to be conceded.  Nor should the question be avoided upon the ground that the error has decreased the railroad tax but a few hundred dollars. In the year 1906, the board of equalization carried their tax rate to the third decimal.  No good reason appears why this should not always be done in figuring these taxes, which deal with large amounts of property in single items.

If the exclusion of the insurance tax meant great and impractical labor in the computation of the railroad tax, there might be ground to justify its retention in the calculations.  It might then well be said that the result was as near an approximation as could reasonably be arrived at.  But the situation presents the reverse of this proposition.  The inclusion of the insurance tax adds one more factor to the complications of the computation.  Its exclusion would simplify the matter.  In this posture of the affair, the erroneous inclusion which complicates cannot be justified on the plea of simplification; nor can the simplifying exclusion be refused because complications ought to be avoided.  The question of the inclusion of this tax is directly involved in the present case.  It should be decided.  If, as the majority opinion suggests, the tax is to be differentiated from the savings bank tax, the reasons should be given.

The rights of the public service corporations are not infringed by the exclusion of the fixed savings bank and insurance taxes from the computation of their proportional shares of the public

burden. Those heretofore unclassified anomalies are not considered in the assessment of property taxes upon unincorporated persons, and the public service companies' charters are neither statutory nor constitutional grounds for claiming an exemption. *Boston etc. R. R.* v. *State*, 62 N. H. 648. The demurrer should be overruled.

BINGHAM, J., *dissenting*. I agree with Judge *Peaslee* in all that he has said; and while little can be added to his able and exhaustive discussion, the question is of such importance, and the opinion of the majority is so fallacious in reasoning and unjust in its result, that I feel I would be remiss in the performance of my duties if I failed to state, in part at least, the views I entertain.

The main question in the case is whether the taxes assessed upon savings banks and fire insurance companies shall be taken into consideration in ascertaining the rate at which railroad, telegraph, telephone, and express companies shall be taxed. The board of equalization, acting under the advice of the attorney-general and in disregard of the decision of the court in *Boston etc. R. R.* v. *State*, 62 N. H. 648, have added the amount of savings bank deposits and fire insurance capital to the amount of property in the various cities and towns throughout the state, and the amount of the tax raised upon savings bank deposits and fire insurance capital, at the fixed rates of three quarters of one per cent and one per cent, to the amount raised in cities and towns throughout the state to meet the public charges incurred by them and by the counties and such part of the state charges as have been apportioned to them, and with these figures as a basis have computed the rate for the assessment of the tax upon the above named corporations. The result of this method of computation has been to reduce the amount of tax paid by public service corporations upon their taxable property from $70,000 to $75,000 each year below what they would have had to pay if their property had been taxed at the same rate at which individuals are taxed for town, county, and state purposes upon an equal amount of property. This being the result, the question presented is: Does the statute under which the tax is assessed authorize the adoption of such a method of computation; and if it does, is it sanctioned under the provisions of our constitution?

In *Amoskeag Mfg Co.* v. *Manchester*, 70 N. H. 336, 344, Chief Justice *Parsons*, then an associate justice, in delivering the opinion of the court said: " By an unbroken line of decisions in this state during the last seventy-three years, from the *Opinion of the Justices*, in 1827 (4 N. H. 565) to the decision in this case (*ante, p.* 200), it has been conclusively settled that the constitutional rule of equality

in taxation requires that throughout the same taxing district the same tax shall be laid upon the same amount of property, 'so that each man's taxable property shall bear its due portion of the tax according to its value.' *Opinion of the Court*, 4 N. H. 565, 568. The share which every person is bound to contribute for the protection in the enjoyment of his life, liberty, and property, to which he is entitled (Bill of Rights, *art.* 12), is his proportional part of the expense of such protection according to the amount of his taxable estate. . . . Any scheme of mathematical reasoning which . . . assesses against the plaintiffs a tax greater or less than that assessed to others upon the same amount of taxable estate,—a result in conflict with the constitution and fundamental principles of justice,—is inevitably unsound and erroneous, either in the theory itself, or in the premises upon which such system is based. If the method is correct, the result must be right. If the result is wrong, the reasoning is fallacious. The accuracy of the method of computation is safely and sufficiently tested by the result."

Starting with these declarations as our premise, and they are undoubtedly sound, it is apparent that all taxes upon property which are sanctioned under the provisions of our constitution must be proportional and equal; that each man's taxable estate must bear its due proportion of the public burden according to its value; and that any scheme of mathematical reasoning which assesses against the property of one man in the same taxing district a tax greater or less than that assessed to others on the same amount of taxable property is in conflict with the constitution and fundamental principles of justice, and the reasoning by which such a result is reached is fallacious.

In *Boston etc. R. R.* v. *State*, 60 N. H. 87, it was held, Chief Justice *Doe* delivering the opinion, that the tax assessed upon railroads pursuant to the statute here under consideration was a proportional tax, that it must be laid according to the constitutional rule of equality, and that if it was a state tax it "must be proportional throughout the state"; in other words, that the tax was a property tax, and that the property of the railroad must bear its due proportion of the public burden according to its value. It having been thus determined that the railroad tax is a property tax, we will now consider the nature of the tax assessed upon savings banks.

In *Boston etc. R. R.* v. *State*, 62 N. H. 648, 649, it was held, in an opinion delivered by the same chief justice, that " the savings bank tax (G. L., *c.* 65, *s.* 8) is an anomaly, resting on peculiar. grounds of public policy, and is universally understood to have

acquired the position of an exception to the constitutional rule of equality." In *Somersworth Savings Bank* v. *Somersworth*, 68 N. H. 402, the constitutionality of the savings bank tax was sustained, not, however, on the ground that it was a property tax and that the property of the bank bore its due proportion of the public burden according to its value, but upon the ground, as announced in *Boston etc. R. R.* v. *State*, 62 N. H. 648, that " the savings bank tax is an anomaly, resting on peculiar grounds of public policy, and is universally understood to have acquired the position of an exception to the constitutional rule of equality." The opinion in this case was also written by Chief Justice *Doe*. It was edited by Judge *Walker* after Judge *Doe's* death, and was adopted by his surviving associates, including the present chief justice, as the opinion of the court.

In *State* v. *Griffin*, 69 N. H. 1, 33, Chief Justice *Carpenter*, in speaking of the savings bank tax and the statute authorizing its assessment, said: " This court, in 1883, less than twenty years after the enactment creating the discrimination, declared that 'the savings bank tax is an anomaly, resting on peculiar grounds of public policy, and is universally understood to have acquired the position of an exception to the constitutional rule of equality.' *Railroad* v. *State*, 62 N. H. 648, 649 "; and that it became an exception " solely by virtue of the statute creating it, and less than twenty years of public acquiescence." See, also, *State* v. *Gerry*, 68 N. H. 495, 510. It is therefore authoritatively determined by these decisions that in this state the savings bank tax is not a proportional and equal tax, that the property of the bank does not bear the same amount of tax as is borne by others upon a like amount of property, and that it is not a property tax within the meaning of our constitution, but an anomaly and an exception to the constitutional rule of equality. These decisions are directly in conflict with the earlier decision of *Bartlett* v. *Carter*, 59 N. H. 105, and must be considered as overruling it, to the extent that they hold that the tax upon savings banks is an anomaly and not a proportional tax laid upon property according to the constitutional rule of equality.

It was also held in *Boston etc. R. R.* v. *State*, 62 N. H. 648, that the savings bank tax, being an anomaly and not laid according to the constitutional rule of equality, was not to be taken into consideration in assessing the tax upon railroads; that it was not taken into consideration in assessing state, county, and town taxes upon individuals; and that the railroads stood in no different relation to the tax to be assessed upon them. The syllabus to the case states that " in the assessment of a railroad 'as near as may be in proportion to the taxation of other property' in towns, the

rate at which savings banks are taxed by the state is not considered." There can be no doubt as to the meaning of this decision. The entry of Judge *Isaac W. Smith,* upon the record of the case preserved in 148 Briefs and Cases 321, states that the tax upon railroads is "to be assessed as if there were no savings banks." The entry in Judge *Clark's* docket is that it is "agreed that no deduction of tax should be made on account of savings bank tax being one per cent and other property one and a half per cent." And the figures in the office of the state treasurer show that the tax paid by the railroad was in accordance with the findings of the referees, which excluded the savings bank tax from the computation. The question arose upon an appeal from the tax of 1880. The referees found that the true value of the railroad was $1,900,000; that property generally throughout the state was assessed at 73.6 per cent of its true value; that the railroad should therefore be valued for purposes of taxation at 73.6 per cent of $1,900,000, or at $1,398,400; that the average rate of taxation throughout the state, excluding the tax on savings bank deposits, was $1.52, and including it, $1.44; that the railroad should be taxed at the rate of $1.52 on $1,398,400, and should pay a tax of $21,255.68. In 1880, the railroad paid to the state treasurer on its tax for that year $17,000. This left a balance of $4,255.68 due the state. In 1888, an abatement of $2,331.10 was allowed the railroad on its appeal from the tax of 1881. This sum was applied by the state treasurer, under the direction of Attorney-General Barnard and Edwin G. Eastman, our present attorney-general, upon the balance of $4,255.68, leaving still due the state upon the tax for 1880 the sum of $1,924.58. This balance, with interest to June, 1888, was then paid by the railroad. If its property had been assessed by the referees at the rate of $1.44, which rate would have included the savings bank tax, the tax then assessed against it would have been $20,136.96, or $1,118.74 less than the tax in fact assessed, and the payment made by it would have been correspondingly less. These facts clearly disclose the meaning of the court as expressed in their decision in this case, and demonstrate beyond a doubt that what the court intended to decide, and what they in fact decided, was that in assessing taxes upon railroads the tax upon savings banks should be excluded from the computation.

Again, in the case of *Amoskeag Mfg. Co.* v. *Manchester, supra,* in which the opinion was delivered by our present chief justice, it was decided that in determining the amount of the public burden to be apportioned to the Amoskeag Company as a tax upon its property, the tax assessed upon polls could not be taken into consideration; that a poll tax was not a property tax; that there was

"no constitutional provision as to the relative amounts to be assessed upon polls and upon property"; and that "a legislative enactment requiring such a distribution of the taxes between polls and estates as would compel a portion of the taxpayers to pay on their property more than others paid on the same amount of property would be in violation of the constitution."

But the chief justice, in delivering the opinion of the majority in the present case and construing the statute directing the assessment of taxes upon public service corporations, not only holds that the act directs that a less amount of tax shall be imposed upon the property of public service corporations than is imposed upon a like amount of property owned by others, but also that the statute so construed would be constitutional; for he decides that the board of equalization were right in taking into consideration the savings bank tax in determining the tax to be assessed upon public service corporations, and this notwithstanding the direct effect of such a method of computation is to permit them to pay some $70,000 or $75,000 less tax each year than other taxpayers are required to pay upon the same amount of property. It is indisputable that such a construction of the statute and method of computation produces this result. The answer to the chief justice's present position is that the statute, if it must be so construed, is clearly unconstitutional; and to use his own language as given in *Amoskeag Mfg. Co.* v. *Manchester, supra,* "any scheme of mathematical reasoning which . . . assesses against . . . [the public service corporations of the state] . . . a tax . . . less than that assessed to others upon the same amount of taxable estate,—a result in conflict with the constitution and fundamental principles of justice,—is inevitably unsound and erroneous, either in the theory itself, or in the premises upon which such system is based. . . . If the result is wrong, the reasoning is fallacious. The accuracy of the method is safely and sufficiently tested by the result."

The savings bank tax being a fixed tax, and not one laid according to any rule of proportion or equality,—no matter by what name it may be designated, whether anomaly, excise, or something else,—cannot be taken into consideration in ascertaining the proportional and equal share of the public burden to be assessed upon public service corporations; for, as said in *State* v. *Express Co.,* 60 N. H. 219, "there can be no proportion or equality between that which is fixed and that which is uncertain and fluctuating." This statement of the court in that case was true when it was made and is true today, as applied to the assessment of proportional and equal taxes upon property, and cannot be belittled or snuffed out

by being referred to as being "as self-evident as a preliminary axiom in Euclid."

What has been said as to the savings bank tax applies with equal force to the tax upon fire insurance capital. In neither case are the taxes assessed upon any basis of proportionality or equality to meet the public charges of government, as is the case with those levied upon public service corporations and individuals, and neither should be taken into consideration in assessing the taxes required to be levied upon such corporations or individuals.